## ADLER, et al v. TAX ASSESSOR, et al.
No. 70-9218.

Circuit Court, Broward County.

November 11, 1971.

Henry M. Schmerer of Ruden, Barnett, McClosky, Schuster & Schmerer, Fort Lauderdale, for plaintiffs.

Gaylord A. Wood, Jr., Fort Lauderdale, for defendants Broward County Tax Assessor and State Department of Revenue.

McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, for defendant Broward County Tax Collector.

JAMES F. MINNET, Circuit Judge.

*Final judgment:* This cause came on for final hearing before the court during a trial that lasted four days. Plaintiffs are seeking to have their real property assessments lowered for the tax years 1970 and 1971 on five highrise rental apartment buildings which plaintiffs own and operate. These buildings are located on state road A1A at the south end of the city of Hollywood, one mile from the Dade County line. These buildings are commonly known as —

Galahad Hall North
Galahad Hall South
Galahad III
Galahad Court
Galahad West

It should be noted that as to Galahad West, only the 1971 assess-

ment is being contested as the property was first improved in the year 1970 and the 1971 assessment is the first time the property was assessed as improved.

Plaintiffs have brought this action pursuant to 1969, 1970 Florida Statute §194.171. This statute which was applicable for the first time to the 1970 tax roll (and is also applicable to the 1971 tax roll) differs from its predecessor statute, 1967 Fla. Stat. §196.01, in that the new statute provides for the actions to be at law whereas the prior statute provided for such cases to be in equity.

At the trial it was the position of the defendants that plaintiffs had a burden of proof which was greater than a preponderance of the evidence, that plaintiffs had to exclude every reasonable hypothesis of a legal assessment before the court could consider reducing plaintiffs' assessments. Homer v. Dadeland Shopping Center, Inc., 229 So.2d 834 (Fla. 1969). Plaintiffs on the other hand took the position that cases enunciating that type of view were decided under the prior statute when cases were heard in equity. Plaintiffs' position was that Florida Statute §194.171 applicable to the 1970 assessment for the first time states that the proceedings are now at law and therefore general standards of law are applicable as opposed to showing special equities.

The court is expressly refraining from making a ruling as to which point of view is applicable because the evidence in fact disclosed that there was no reasonable hypothesis of legal assessments on plaintiffs' property, and plaintiffs in fact sustained the higher burden of proof. Plaintiffs also proved that their assessments were grossly excessive to the point of being improper assessments. Camp Phosphate Co. v. Allen, 81 So. 503 (Fla. 1919).

Before discussing the manner in which the assessments were legally insufficient, one point raised by the plaintiffs which the court has disregarded should be discussed. The plaintiffs contended that the Galahads have been assessed at 100% of just valuation while other properties in the county have been assessed at a lower per cent. If this were true plaintiffs' assessments would have to be reduced accordingly. Sioux City Bridge Co. v. Dakota County, Neb., 260 U.S. 441, 43 Sup. Ct. 190 (1923); Dade County v. Salter, 194 So.2d 587 (Fla. 1967). To sustain this point plaintiffs have introduced the auditor general's report of January 29th, 1971, relating to the 1970 assessment, which states that Broward County was assessed at 84% of just valuation. To contradict this point the defendants have put in evidence the decision of Stuart v. Askew, file no. 71-58, circuit court, Leon County (April 5th, 1971). That decision declares the auditor general's report to be null and void. It is therefore the finding of the court that plaintiffs have not

shown that other properties in the county have been assessed at less than 100%. Therefore, plaintiffs are not entitled to any reduction of their assessment based on that point further than what the court has found in this judgment.

The following discussion will disclose the various improprieties in the assessments on the Galahads.

Criteria number 8 of 1969, 1970 Florida Statute §193.011, was not used at all by the tax assessor in arriving at plaintiffs' assessments. Criteria 8 first appeared among the statutory criteria in 1967. 1967 Laws of Florida, Ch. 67-167 (House Bill No. 390). Prior to that time only the first seven criteria were in the statutes. The Florida Supreme Court in Walter v. Schuler, 176 So.2d 81 (Fla. 1965), upheld the validity of the first seven criteria and said that a fair assessment was synonymous with the amount a purchaser willing, but not obligated to buy, would pay to one willing, but not obligated to sell. It therefore appears that the plain meaning of criteria 8 is to arrive at the assessed value by taking the emphasis off what the actual purchase price is, and putting the emphasis on what the seller under normal conditions would receive on the basis of the purchase price arrived by the first seven criteria. To say it another way, criteria 8 is based on the *net* proceeds that a seller would receive after the first seven criteria are applied.

The court is of the opinion that the statute is plain on its face and therefore the court did not rely on the testimony of Gifford Grange the legislator from Jacksonville who introduced criteria 8 in the House of Representatives even though his testimony of the legislative history reached the same conclusion.

The evidence revealed that plaintiffs' assessments were based on the purchase price if the properties were sold without deducting therefrom the net proceeds plaintiffs would receive from such a sale.

The tax assessor also did not take into consideration in assessing the Galahads "the income from said property" as provided by criteria 7 of 1969, 1970 Florida Statutes §193.011. The evidence disclosed that income data was never applied to the assessment of the Galahads even though the assessor had plaintiffs' financial statements before making the assessments. Income data was not even routinely considered by the assessor. In the last two years only two parcels in the county, both involving retail stores, had their assessment affected by considering income. Not only do the Galahad property cards in the assessor's office contain no income data, but no other property cards in the assessor's office contain income data either, despite the fact that the assessor states in a brochure he distributes to the public that income data is contained on all property cards involving income producing properties.

While either of the two aforementioned points would establish an essential departure from law by the assessor, the plaintiffs also demonstrated as set forth below that the assessor did not apply his own standards, which he used on other properties in the county, in assessing the Galahads.

The assessor admitted that there was a dollar a square foot error in computing the land assessment of the Galahad West. He assessed the land of the Galahad West at $3 a square foot when all neighboring property was assessed at $2 a square foot. He admitted that this was a posting error. It should be pointed out that this error is not small — he computed the land as consisting of 65,214 square feet.

The Galahad West building was likewise computed erroneously. The building was assessed at $12.92 a square foot which was 68 cents a square foot higher than the other four Galahad buildings. The explanation of the assessor's staff for this difference was that the assessor had "classified" the West building "better" than the other Galahads. The classification was made not because the building was of a better quality than other Galahads but because construction costs increased for the year 1971. Furthermore, the assessor did not change the construction rate in his building manual which was based on 1970 costs and used the 1970 costs for 1971 in computing other buildings in the county including the other Galahad buildings.

The lands underlying the first four Galahads were assessed disproportionately higher in 1970 than other oceanfront lands in the same neighborhood which contained an old hotel and a trailer park. Before the board of tax adjustment the assessor's office took the position that the reason was because of zoning even though all the properties were zoned for highrise apartments. At the trial the position taken by the assessor's office was that the reason there was a difference was because the other properties were not being used to their highest and best use. While standing alone this would of course be a valid reason why similar properties would have a different assessment; in practice this was not the result, since when the assessor computed the building values on the old hotel and trailer park, their assessments were downgraded because they were not being utilized to their highest and best use. Thus the effect was to downgrade the old hotel and trailer park twice while conversely upgrading the Galahad properties twice. This did not provide for a uniformity in assessment between the Galahads and other properties in the neighborhood. This evil is specifically cautioned against on page 42 of the *Florida Tax Assessor's Guide*. (See a further discussion of this guide later in this judgment.)

The assessments on the first four Galahad buildings were wrought with errors. The assessor stated that buildings under ten years of age, as are the Galahads, are automatically given a 1% per year depreciation for each year the building was on the tax roll. The Galahad North however was given an additional year of depreciation which the assessor stated was an error. Additionally the court finds that the automatic 1% depreciation as applied to the Galahads did not take into account the actual date the buildings were built which could amount to almost another full year as would be the case with the Galahad South and Galahad Court, both being completed in the first two months of the prior taxable year. In addition this automatic 1% per year depreciation presupposes that all buildings are physically depreciating at the same rate and that there are no extenuating circumstances such as depreciation as a result of economics or obsolescence.

Also the assessor miscomputed the number of floors on the first three Galahads which are 15 story buildings. His office computed the square foot dollar rate on those buildings as if they were 16 story buildings. In fact the Galahad Court which is a 16 story building has the identical square foot rate as the first three Galahads. The error apparently resulted from assigning an additional "framing" unit value from the assessor's *Building Cost Manual* to the first three Galahads. Page 88 of the assessor's *Building Cost Manual* provides that a 15 story building is to receive 21 framing units. The property cards of the first three Galahads shows the framing to be 22 which is the amount for a 16 story building and the number used on the other two Galahads which are 16 story buildings.

The assessor's *Building Cost Manual* describing the replacement costs and the formula and criteria for applying those costs to all improved property in the county was not applied uniformly in other respects. All employees of the tax assessor who work on building costs are required to use the manual and to use it uniformly. In practice however individual deputy assessors are permitted and even encouraged to use criteria and formulas on properties including the Galahads which do not conform to the methods set forth in the manual. One specific example is that because the first three Galahads are "Y" in shape they received two extra construction cost units although nowhere in the manual was there a provision for this type of increase.

While on one hand the assessor requires the manual to be used uniformly there is a lack of checks within his office to insure the uniform application of the manual. There are no overall checks in the commercial properties division which is responsible for assessing the Galahads, and there are never any checks between

buildings that are commercial properties, buildings that are in trailer parks, and buildings that are one and two family residences.

Plaintiffs are thus discriminated against in the application of the *Building Cost Manual* because there are no provisions made to check that plaintiffs are being assessed in a manner uniform and consistent with other properties in the county but are subjected to the arbitrary decisions of specific individuals who are working on the Galahads' assessments.

Other procedures in the assessor's office work against the plaintiffs. It is virtually impossible to recheck the computations of the tax assessor's staff as the property cards contain only ultimate data and there are no back up notes from the staff members who recorded the ultimate information on the cards. In addition square footage of buildings is not reported on an actual basis but is adjusted and there is no way of knowing what was omitted and what was included in arriving at the adjusted figures. In addition while the land underneath the Galahads was computed on a square foot basis other apartment buildings on the ocean in Fort Lauderdale were computed on a front foot basis. This makes comparisons very difficult — the assessor's office did not compute the Galahads on a front foot basis so as to be able to check that those assessments are compatible with assessments in the Fort Lauderdale beach area.

The assessor takes the position and the court agrees as a matter of law that there is but one total assessment on an improved parcel of land and that there is not a separate land assessment or a separate building assessment. Contrary to the assessor's own admission, he assessed the Galahads and all other properties in the county separately by land and building and merely added the two to get the final assessment figure. As a result of this procedure the plaintiffs have been discriminated against — because different staff members of his office in completely separate departments work up the land and building values without any correlation between the two. In fact the procedure in the assessor's office was such that the assessor would review land values with one person from his land department and then on a separate occasion review building values with another person from his building department. Then the posting department merely added the two separate assessment figures for the final assessment. As already pointed out in this judgment, this type of procedure leads to a situation where property that is poorly improved is downrated by both the land department and the building department while a better improved property such as the Galahads is upgraded by both departments.

This procedure of the assessor's office is further discriminatory to the plaintiffs in that it does not take into account the total

economics of the property including its income. Further it becomes almost impossible to compare the assessment of the Galahads with similar type properties because each property's land and building values were arrived at separately and only bear comparison to a parcel of land with a different type building on it and to a building situated on a different type of land.

The assessor further improperly assessed the Galahads by not following the *Florida Tax Assessor's Guide*. 1969 Florida Statutes §195.021 (applicable to the 1970 tax roll) and 1970 Florida Statutes §§195.032, 195.062 (applicable to the 1971 tax roll) provide that tax assessors must follow the *Florida Tax Assessor's Guide*. The statutes also provide that the burden of proof is upon the assessor to show why he did not follow that guide. This is also the case law, Burns v. Butscher, 187 So.2d 594 (Fla. 1966).

The present guide was prepared by the state comptroller, the state official prior to the government reorganization act responsible for its preparation, pursuant to 1967 Florida Statutes §192.31, the predecessor statute. Plaintiffs have claimed many deviations from this guide — and the assessor failed to carry his burden of showing why he deviated from the guide.

One of the most notable deviations from the guide is that the guide states that the income analysis approach for rental apartments is the most indicative of value of the three standard appraisal approaches to value — the other two approaches to value being the replacement cost and the market value approaches. See pages 20-21, 28-38 of the guide. Besides not using the income analysis approach as being most indicative of value, the assessor completely ignored the manner in which the income analysis approach is to be used. In addition, the assessor's income consultant and appraiser completely ignored the requirements set forth in the guide requiring the tax millage component to be included in the capitalization rate and to exclude the property tax expense in computing net income. See pages 29, 32, 36 of the guide. Another notable deviation from the guide has already been discussed in this judgment.

Because of the deficiencies discussed above the court finds that the assessments on the Galahads were improper. It is therefore necessary for the court to determine the amount plaintiffs' property should be assessed. To determine the amount of the assessments the court heard evidence from expert appraisers on behalf of the plaintiffs and the defendants. The experts were in agreement on a substantial number of points. They agreed that the income approach to valuation was the most important and significant one to be applied to this case as opposed to the other two standard approaches which they also considered. The appraisers were of the opinion that in this case the cost reproduction approach was

the least accurate. The market approach was found not too accurate because there were not a sufficient number of comparable sales of properties similar to the Galahads. The court therefore finds that the income approach to value was the polestar of this case.

The appraisers also agreed that as to all five buildings there was a sufficient period of time to indicate the income derived from the buildings and there were no unrealistic fluctuations applicable to the tax years in question. There was no evidence disclosing that plaintiffs' actual rentals were artificially low or that they had been fraudulently contrived for tax assessment purposes. Both appraisers were correct in using plaintiffs' figures as a basis for arriving at appraised "economic rent" and "adjusted net income" based upon what similar highrise apartment buildings in the area were receiving for rent and ultimately net income.

It should be noted that plaintiffs' appraiser, Edward M. Waronker, an independent appraiser in the South Florida area, compiled his data personally and by making independent inquiries. Defendants' appraiser, William Shenkel, a deputy tax assessor, relied heavily on the data furnished him by the assessor's office including financial statements of other apartment buildings given to the assessor but not available for public inspection. Despite their different sources, the basic data upon which each relied was very similar.

The appraisers' primary disagreement in arriving at fair market value was that they used different capitalization rates. Defendants' appraiser relied heavily on sales of highrise apartment buildings not similar or comparable to the Galahads. The Galt Towers relied on by defendants' appraiser is located in an economic area different from the Galahads, over 10 miles away. Other properties were even further economically and geographically removed from the Galahads. Also there was not sufficient data available to make the comparisons meaningful. On the other hand, plaintiffs' appraiser relied more heavily on "bands of investment" based upon the rate of return investors would expect to receive on properties similar to the Galahads. Therefore, the court finds as correct and proper the capitalization rate used by plaintiffs' appraiser.

Upon considering all the evidence the court finds that the assessments on each of the properties (as identified by their tax folio numbers) should be reduced to the following sums —

As to 1970 and 1971:

| | |
|---|---|
| Galahad Hall North (1224-01-042) | $5,183,000 |
| Galahad Hall South (1226-00-002) | $5,120,000 |
| (1226-01-002) | |

| | |
|---|---|
| Galahad III (1226-00-003) (1226-01-011) | $5,170,000 |
| Galahad Court (1226-00-004) (1226-01-018) | $3,620,000 |

As to 1971 only:

| | |
|---|---|
| Galahad West (1224-01-061) | $2,638,000 |

(Editor's note—Total of above: $21,731,000. Assessed value was $28,837,920.)

The court has found the same assessments should be applicable for 1970 and 1971 on the first four Galahads upon evaluating the testimony of the appraisers. While the assessor had reduced the assessments on the Galahads and other existing buildings in the county by 1% for 1971, there was some indication that land values and construction costs had increased in 1971 over 1970. Therefore, the court finds that to reduce the assessments for 1971 would be inconsistent with the evidence on just valuation and give the Galahads a lower assessment than other properties in the county. If the assessments on the Galahads were increased, then that would discriminate against the Galahads. Sioux City Bridge Co. v. Dakota County, Neb., 260 U.S. 441, 43 Sup. Ct. 190 (1923); Dade County v. Salter, 194 So.2d 587 (Fla. 1967).

For the year 1970 plaintiffs paid into the court registry in good faith the amounts of their tax bills that they had admitted, taking advantage of the permitted November discount. Since the assessments determined by the court are greater than those admitted by the plaintiffs, plaintiffs will owe additional taxes for the year 1970. The tax difference shall be determined by subtracting the newly computed taxes from the taxes actually paid. 1969 Fla. Stat. §194.192(2). The difference in taxes so computed shall then be reduced to the amount plaintiffs would have paid by taking the November discount. Dade County v. Eastern Air Lines, Inc., 207 So.2d 13 (Fla. 3 App.), opinion adopted, 212 So.2d 7 (Fla. 1968). Plaintiffs shall pay said net difference in taxes together with interest at the rate of 6% per annum computed from December 1, 1970 until actually paid. 1969 Fla. Stat. §194.192(2).

For the year 1971, the newly computed taxes shall reflect the standard discounts as there is still time for the plaintiffs to take advantage of those discounts if plaintiffs desire.

Because the court's findings of the proper total assessments on all the Galahad properties are approximately 2.0 million dollars for 1970 and 3.5 million dollars for 1971 above plaintiffs' admitted values of 17.2 million dollars for 1970 and 18.2 million dollars for 1971, the court is reserving ruling at this time as to whether plaintiffs are entitled to recover all costs against the defendants pursuant to 1969, 1970 Fla. Stat. §194.192(1).

For the foregoing reasons it is ordered and adjudged —

The defendants shall reduce the assessments for the years 1970 and 1971 on the subject properties to the amounts set forth above.

The defendants shall submit forthwith corrected tax bills to the plaintiffs for the years 1970 and 1971 in the manner described in this judgment. Upon the defendants filing and serving a notice that this has been done, the temporary injunction against the defendant, W. H. Meeks, Jr., as tax collector of Broward County, heretofore entered in this cause shall be dissolved, effective 30 days from service of said notice.

The determination of whether plaintiffs are entitled to recover all costs against the defendants and the amount, if any, shall be made at a subsequent hearing upon due notice to all parties.

The court shall retain jurisdiction of this proceeding for the purpose of carrying out the orders specified herein.